# In the United States Court of Federal Claims

No. 23-843
Filed: March 13, 2024

---

**DANIEL S. NICHOLSON and
PATRICIA E. MIDGETT,**

               *Plaintiffs,*

**v.**

**THE UNITED STATES,**

               *Defendant.*

---

*Lindsay S.C. Brinton*, with *Meghan S. Largent*, *Michael Armstrong*, and *Lucas D. Jackson*, Lewis Rice LLC, St. Louis, Missouri, for Plaintiffs.

*Peter W. Brocker*, Natural Resources Section, with *Todd Kim*, Assistant Attorney General, Environment & Natural Resources Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**TAPP, Judge.**

"There is a pleasure in the pathless woods[.]"[1] Yet for the *Hyatt* and *Nicholson* Plaintiffs (collectively referred to as "Plaintiffs"),[2] that pleasure was replaced with the pain of usurped property rights. Tn its pursuit of public amenities, the United States transformed Plaintiffs' land previously burdened by an unused railway into a different burden—a walking trail. Plaintiffs bring this rails-to-trails case contesting the United States' action as an uncompensated taking.

---

[1] Lord Byron, Childe Harold's Pilgrimage (1812–18) canto 3, st. 22.

[2] As it relates to this rail corridor, the Court manages two related cases, *Rickey A. Hyatt and Barbara Hyatt v. United States,* Case No. 23-499, and *Daniel Nicholson and Patricia Midgett v. United States,* Case No. 23-843. The United States moved to consolidate these cases, (*Hyatt* Mot. to Consol., ECF No. 6). Plaintiffs objected for their own case management purposes, (*Hyatt* Resp. to Mot. to Consol., ECF No. 7); thus, the Court denied that motion. However, the parties filed joint briefing. This Opinion addresses both cases and will be filed in both dockets, the only difference will be the case captions. To the extent the Court refers to a specific filing, it will denote that filing with the label *Hyatt* or *Nicholson*.

The United States moves for summary judgment, primarily arguing that because compensation is not available to Plaintiffs, there can be no taking. (*Hyatt* Defendant's Motion for Summary Judgment, ECF No. 18; *Nicholson* Defendant's Motion for Summary Judgment, ECF No. 13 (collectively referred to as "Def.'s Mot. for Summ. J.")). Plaintiffs cross-move for partial summary judgment as to liability, arguing that the United States' action of changing the nature of an easement on their property effected a taking. (*Hyatt* Plaintiffs' Motion for Partial Summary Judgment, ECF No. 19; *Nicholson* Plaintiffs' Motion for Partial Summary Judgment, ECF No. 14 (collectively referred to as "Pls.' Mot. for Part. Summ. J.")). Plaintiffs further argue that the Court should clarify certain calculations relating to just compensation. (*See generally* Pls.' Mot. for Part. Summ. J.). The Court disagrees; conclusions as to those calculations are inappropriate at this stage. Ultimately though, the Court agrees that the United States has taken Plaintiffs' property for public use. Therefore, Plaintiffs' Motion is granted-in-part and the United States' Motion is denied. The quantum of compensation is premature and left for another day.

## I.      Background

### A.      The Trails Act

The National Trails System Act, 16 U.S.C. §§ 1241 *et seq.* ("The Trails Act"), allows for the transformation of inactive railroad corridors into recreational trails if the right-of-way is still preserved for potential future use as a railroad. To begin this process under the Trails Act, a railroad company may be permitted to abandon its easement over a railroad corridor after an application process with the Surface Transportation Board ("STB"). 49 U.S.C. § 10903; *see also id.* § 10502.

Under the Trails Act, qualified private organizations or public agencies may intervene to railbank the corridor before abandonment is consummated by agreeing to serve as a trail operator in the interim. 16 U.S.C. § 1247(d). The railbanking intervention process allows a railroad to negotiate with the intervening entity which would then assume financial and managerial responsibility for the corridor by operating it as a recreational trail. 28 A.L.R. Fed. 3d Art. 6 (citing *Preseault v. Interstate Com. Comm'n*, 494 U.S. 1, 6–7, (1990) ("*Preseault I*")).

To allow for this process, the STB may issue a Notice of Interim Trail Use or Abandonment ("NITU"). 49 C.F.R. § 1152.29. If the railroad and trail sponsor come to an agreement, then the parties notify the STB, the corridor is railbanked, the STB retains jurisdiction, and "interim trail use is thereby authorized." *Preseault I*, 494 U.S. at 7 n.5 (1990); *see also* 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29(h). If the parties do not reach an agreement, the railroad may exercise its STB-granted authority to abandon the line. 49 C.F.R. § 1152.29(d)(1), (e)(2); *see also Citizens Against Rails-to-Trails v. STB*, 267 F.3d 1144, 1150–53 (D.C. Cir. 2001).

### B.      A Railbanking Success Story

Greensboro, North Carolina is home to more than one hundred miles of "natural and paved trails designed for walking, hiking, biking, or simply enjoying the outdoors." Greensboro Parks & Recreation, *Trails & Greenways*, https://www.reensboro-nc.gov/departments/parks-

recreation/trails-greenways (last visited Feb. 1, 2024). To expand that trail network, the City of Greensboro (the "City") and Norfolk Southern Railway Company ("Norfolk Southern") negotiated for the sale of a 3.1-mile rail corridor within the City of Greensboro. (Def.'s Mot. for Summ. J. Ex. A (Deposition of the City of Greensboro by Christian Wilson ("Wilson Dep. (5.18.22)), at 5:21–6:18 (City of Greensboro and the Railway were negotiating the sale of the Rail Corridor for years before 2019), *Hyatt* ECF No. 18-1, *Nicholson* ECF No. 13-1). In April 2019, and before Norfolk Southern initiated abandonment proceedings, the City agreed to purchase Norfolk Southern's interest in the 3.1-mile rail corridor. (*Id.* Ex. B (Agreement of Purchase and Sale), *Hyatt* ECF No. 18-2, *Nicholson* ECF No. 13-2). The sale was contingent upon successfully railbanking the corridor via the Trails Act. (*Id.* Ex. A (Wilson Dep. at 21:19–22:15)).

Norfolk Southern filed a verified Notice of Exempt Abandonment with the STB to facilitate the transaction. The notice sought approval for abandoning rail service along a 3.1-mile rail line situated in Greensboro between Mileposts CF-65.6 and CF-68.7 (referred to as the "Line"). (Pls.' Mot. for Part. Summ. J. Ex. I, *Hyatt* ECF No. 19-9, *Nicholson* ECF No. 14-9). This Notice was slated to become effective on October 13, 2019. (Def.'s Mot. for Summ. J. Ex D (citing 84 Fed. Reg. 48383), *Hyatt* ECF No. 18-4, *Nicholson* ECF No. 13-4). Simultaneously, on the day of publication, the City submitted a request to the STB, urging it to issue a NITU in lieu of outright abandonment of the Line pursuant to its agreement with Norfolk Southern. (Pls.' Mot. for Part. Summ. J. Ex. J (City's Sept. 13, 2019 STB filing), *Hyatt* ECF No. 19-10, *Nicholson* ECF No. 14-10).

Norfolk Southern informed the STB of its willingness to engage in negotiations with the City to reach an agreement for interim trail use (Pls.' Mot. for Part. Summ. J. Ex. K (Norfolk Southern's Sept. 20, 2019 STB filing), *Hyatt* ECF No. 19-9, *Nicholson* ECF No. 14-9). Accordingly, on October 11, 2019, the STB issued a NITU authorizing the parties to negotiate and finalize an interim trail use agreement under 49 C.F.R. § 1152.29 for one-hundred eighty days, until April 8, 2020. (*Id.* Ex. L. (NITU), *Hyatt* ECF No. 19-12, *Nicholson* ECF No.14-12). Less than a month later, on November 8, 2019, Norfolk Southern notified the STB that negotiations were successful, and a Trail Use Agreement had been reached. (*Id.* Ex. M (Norfolk Southern's Notice of Consummation of Trail Use Agreement), *Hyatt* ECF No. 19-13, *Nicholson* ECF No. 14-13).

On November 8, 2019, Norfolk Southern officially conveyed its interest in the Line to the City via a "Non-Warranty Deed" and under the parties' April 2019 Purchase and Sale Agreement. (Pls.' Mot. for Part. Summ. J. Ex. N (Non-Warranty Deed from Norfolk Southern to the City), *Hyatt* ECF No. 19-14, *Nicholson* ECF No. 14-14; *see also* Ex. O (Purchase and Sale Agreement), *Hyatt* ECF No. 19-15, *Nicholson* ECF No. 14-15). The Non-Warranty Deed attached a legal description and surveys depicting the boundaries and dimensions of the railroad corridor being sold to the City. (*Id.* Exs. N, P, *Hyatt* ECF No. 19-16, *Nicholson* ECF No. 14-16). The Purchase and Sale Agreement and the Non-Warranty Deed both specified that the dimensions of the right-of-way being conveyed to the City would be controlled by this survey. (Pls.' Mot. for Part. Summ. J. Exs. N, O).

The survey attached to the Non-Warranty Deed depicts the width of the easement over Plaintiffs' property to be one hundred feet wide. (*Id.* Exs. N, P (showing two hundred feet total,

one hundred feet on either side of the centerline)). The United States characterizes this survey description as "overbroad," encompassing more interest than Norfolk Southern possessed. (Def.'s Resp. at 12, *Hyatt* ECF No. 24, *Nicholson* ECF No. 19).

C.     *Litigation Ensues*

After the conversion to a trail, Plaintiffs initiated legal actions seeking just compensation for establishing a new trail easement on their respective properties. (*Hyatt* Compl., ECF No. 1; *Nicholson* Compl., ECF No. 1; *see also* Pls.' Mot. for Part. Summ. J. Ex. P (Survey) at 15, 22). Since 2001, Ricky and Barbara Hyatt own property abutting the rail corridor at 1310 Whilden Place, Greensboro, North Carolina. (*See* Pls.' Mot. for Part. Summ. J. Ex. A (Hyatt Deed), ECF No. 19-1).



(PLS.' MOT. FOR PART. SUMM. J. EX P. AT 15).

One mile away, across North Buffalo Creek, Daniel Nicholson and Patricia Midgett own property abutting the rail line at 310 Hillside Drive, Greensboro, North Carolina. (*See id.* Ex. B (Nicholson Deed), ECF No. 19-2).



(PLS.' MOT. FOR PART. SUMM. J. EX P. AT 22).

Plaintiffs allege uncompensated takings of their property interests in the name of the National Trails Act. *See* 16 U.S.C. § 1274(d); s*ee also Hyatt* Compl.; *Nicholson* Compl. (both premising liability on issuance of the NITU)).

## II.    Analysis

The United States argues that it is entitled to summary judgment for three reasons: (1) because "the only just compensation available to Plaintiffs is a nominal award that this Court lacks jurisdiction to provide," (Def.'s Mot. at 11–19); (2) "a trail sponsor's use rights under a Trails Act easement are not exclusive," (*id.* at 19–21); and (3) "Plaintiffs' improvements do not interfere with interim trail use," (*id.* at 21–24). Plaintiffs take a more novel approach, moving for partial judgment as it relates to liability. (Pls.' Mot. for Part. Summ. J. at 13–17). Separate from the issue of liability, Plaintiffs go on to argue that: (1) the dimensions of the right-of-way are controlled by the survey attached to the non-warranty deed between Norfolk Southern and the City, (*id.* at 17–19); (2) the proper calculation of just compensation includes the addition of severance damages, where appropriate, (*id.* at 19–24); and (3) that Plaintiffs have lost the right to exclude others from their properties, (*id.* 24–27).

Ultimately, the Court finds that the United States committed a taking by issuing a NITU and expanding the easement meant specifically for railroad purposes. The Court also finds that genuine issues of material fact exist as to the precise dimensions of that taking. Finally, the Court declines to make any findings on just compensation calculation until Plaintiffs have had a fulsome opportunity to complete valuation discovery.

### A.    Standard of Review

The Court may grant summary judgment if the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine factual dispute exists when "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* A party seeking to establish a genuine dispute of material fact must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations [ ], admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A).

While "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), summary judgment may still be granted when the party opposing the motion submits evidence that "is merely colorable . . . or is not significantly probative." *Anderson*, 477 U.S. at 251 (internal citation omitted). However, the moving party "need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp.*, 477 U.S. at 325). Courts may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita, Elec. Indus. Co., Ltd. v. United States*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). A trial court is permitted, in its discretion, to deny even a well-supported motion for summary judgment, if it believes the case would benefit from a

full hearing. *Lowery v. United States*, 167 Fed. Cl. 28, 37 (2023) (citing *United States v. Certain Real & Pers. Prop. Belonging to Hayes*, 943 F.2d 1292 (11th Cir. 1991)).

     *B.*     *Takings and Rails-to-Trails Landscape*

     "[F]or all that the [g]overnment takes it must pay." *In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 159 Fed. Cl. 512, 532 (2022) (quoting *United States v. Dickinson*, 331 U.S. 745, 750 (1947)). The Fifth Amendment of the United States Constitution places an important limit on the government's power to take private property. *Preseault I*, 494 U.S. at 11 (1990). As a bedrock principle of the United States Constitution, it mandates that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.[3]

     In Trails Act cases, a taking occurs when "government action destroys state-defined property rights," either "by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement," *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010), or by compelling the continuation of a railroad-purposes easement to accommodate negotiations for a trail-use agreement, even if the negotiations are ultimately unsuccessful. *See id.* at 1025; *see also Caquelin v. United States*, 959 F.3d 1360, 1367 (Fed. Cir. 2020) ("*Caquelin III*").

     Whether a plaintiff is entitled to compensation in Trails Act litigation depends on meeting two prongs of a three-prong test—stated differently, a taking occurs if the railroad only held an easement in the taken land (prong 1) and if one of the other two prongs is met. The Federal Circuit set out these prongs in *Preseault II*:

          (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates;

          (2) if the Railroad acquired only easements, if the terms of the easements were limited to use for railroad purposes, then the authorization for future use

---

[3] The Court employs a two-part test to determine when a government action constitutes a taking. *See Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1329 (Fed. Cir. 2021). Under the first step, the Court "determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *See Acceptance Ins. v. United States*, 583 F.3d 849, 854 (2009). This step is a "threshold" matter, for if a claimant fails to demonstrate the existence of a legally cognizable property interest, the Court's task is at an end. *See Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1373 (Fed. Cir. 2004). Only when the first step is satisfied does the court determine whether that property interest was "taken." *Id.* at 1372. The plaintiff bears the burden of establishing a cognizable property interest for its takings claim. *See Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 519 n.12 (Fed. Cir. 2011).

as public recreational trails constituted a taking [i.e., exceeds the scope of the easements]; or

(3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, if the easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements then a taking occurred [i.e., abandonment of the easement].

100 F.3d 1525, 1550 (Fed. Cir. 1996) ("*Preseault II*") (en banc) (plurality opinion); *see also Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009).

A taking pursuant to the Trails Act occurs when "state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use." *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004) (internal citations omitted). Because the Board's issuance of a NITU forestalls the full abandonment of the railroad line, it is often what constitutes "the government action that prevents the landowners from possession of their property unencumbered by the easement." *Ladd*, 630 F.3d at 1023; *accord Caquelin III*, 959 F.3d at 1367 ("The NITU . . . was a government action that compelled continuation of an easement for a time; it did so intentionally and with specific identification of the land at issue; and it did so solely for the purpose of seeking to arrange, without the landowner's consent, to continue the easement for still longer, indeed indefinitely, by an actual trail conversion."); *Barclay v. United States*, 443 F.3d 1368, 1374 (Fed. Cir. 2006) ("The barrier to reversion is the NITU, not physical ouster from possession."); *Caldwell*, 391 F.3d at 1233–34 ("The issuance of the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way."). Because this legal mechanism forestalls the landowners' unencumbered possession of their property, hindering the future reversion through the railbanking process is pivotal in considering whether there was a taking.

C.    Liability

Property rights are determined by the operation of state law. *Castillo v. Diaz*, 952 F.3d 1311, 1319 (Fed. Cir. 2020). The United States does not contest Plaintiffs' property interests. (*See generally* Def.'s Mot. for Summ. J.). Plaintiffs have provided deeds and tax records, (Pls.' Mot. for Part. Summ. J. Ex. A (Hyatt Deed); Ex. B (Hyatt property tax records); Ex. C (Nicholson Deed), ECF No. 19-3, Ex. D (Nicholson property tax records), ECF No. 19-4), confirming they owned the properties adjacent to and underlying the right-of-way at the time the STB issued the NITU. Therefore, the first prong of *Preseault II* is satisfied.

As to the second prong of *Preseault II*, whether the terms of the easements were limited to use for railroad purposes, this is again uncontested. As the United States points out, North Carolina "[c]ourts generally have refused to find an abandonment when a railroad leased or sold a right-of-way for uses *not inconsistent with railroad purposes*." (Def.'s Mot. for Summ. J. at 14 (citing *City of Charlotte v. BMJ of Charlotte, LLC*, 675 S.E.2d 59, 66 (N.C. Ct. App. 2009)) (emphasis added)). However, under North Carolina Law, a recreational trail is beyond the scope of an easement for railroad purposes. *See, e.g., Brown v United States*, 153 Fed. Cl. 318 (2021). Thus, "a compensable taking occurs in North Carolina when the issuance of a NITU results in

the conversion of a railroad-purposes easement into a recreational-trail easement." *Id.* at 331. Because it is uncontested, and because the default rule in North Carolina is that a recreational trail is beyond the scope of a railroad purpose, the Court finds that Plaintiffs have also satisfied the second prong of *Preseault II*.

This begs the question, what are we doing here?

On its face, Plaintiffs have the perfect formula to establish liability: a NITU was issued, a trail agreement was reached, Plaintiffs established a valid property interest, and the trail is outside of the prescribed easement. This formula appears to conform to the United States' positions in past litigation that a taking occurs when a successful trail use agreement is reached. *See e.g., Memmer v. United States*, 50 F.4th 136, 144 (Fed. Cir. 2022) ("The government urges that our cases have found a taking to have occurred only where the NITU either (a) *resulted in a trail-use agreement*; or (b) compelled a delay in the railroad's abandonment of its line." (emphasis added)), *aff'g-in-part den'g-in-part* 150 Fed. Cl. 706 (2020). Even on the same rail line, the Court is aware that the United States has not contested its liability. *See Agapion v. United States*, 167 Fed. Cl. 761, 766 (2023) ("Defendant does not dispute liability.").[4] It is unclear how Plaintiffs' circumstances in this case differ. However, the United States now argues that these facts are of no consequence. Specifically, because Norfolk Southern "would not have abandoned the corridor in the absence of a NITU," (Def.'s Mot. at 1), the United States now believes that no just compensation is owed, so it cannot be liable for a taking. (*Id.* at 1–3). This is untenable.

Insomuch as the United States asserts that Norfolk Southern's intent to abandon is relevant to liability since a trail-use agreement was reached, it is not. The United States cites the declaration of a Norfolk Southern representative who testified that "[i]f a final trail use agreement had not been reached, Norfolk Southern would not have abandoned the Line; rather, the Company would have exercised the lesser-included discontinuance authority to preserve the rail corridor for future rail service." (Def.'s Mot. for Summ. J. at 4 (citing Ex. F (Decl. of Kristi D. Blair) at ¶ 10), ECF No. 18-6). A railroad's intent has been a central topic of many recent Court of Federal Claims and Federal Circuit cases. And the Court acknowledges that caselaw is firm that "a NITU does not effect a taking if, even in the absence of a NITU, the railroad would not have abandoned its line (a necessary prerequisite for termination of the easement under state law) during the period of the NITU." *Caquelin III* at 1363. This is because "in such a case, the NITU takes nothing from the landowner that the landowner would have had in the absence of the NITU." *Id.* However, this "but for the NITU" analysis, is specific to cases where no trail-use agreement has been reached. It cannot be overemphasized, that is not the case here.

In 2022, the Federal Circuit decided *Memmer v. United States*, reaffirming the holding in *Caquelin* and examining the railroad's intent to abandon in a situation where a trail-use agreement was <u>not</u> reached during the NITU period. 50 F.4th at 146. Even there, the Court unequivocally stated, "[w]e fail to see, though, how [evidence of other trail use negotiation]

---

[4] In March 2022, the Court conducted a valuation trial for two interconnected cases, as detailed in *Agapion v. United States*, No. 19-cv-1596 (Fed. Cl.), ECF Nos. 144, 151, 152, and *Chapman Spring/Garden, LLC v. United States*, No. 19-cv-1942 (Fed. Cl.), ECF Nos. 110, 117, 118.

helps the government when, *had a trail-use agreement been reached during the NITU, a taking of Appellants' property would have occurred.*" *Id.* (internal citations omitted) (emphasis added). The recognition of such a principle traces back to the early days of *Preseault*, where it was established that the transformation of an easement for railroad purposes into one for public trail use constituted a taking of a new easement, thereby warranting compensation for the affected landowners. *Preseault*, 100 F.3d at 1550; *see also Lowery*, 167 Fed. Cl. at 40 (finding that "a successful trail-use agreement would still lead to a taking.").

From a practical standpoint, this is the only coherent outcome in the real world. First, there is reason to believe that an economic advantage exists when property owners are certain as to what their rights are. If everchanging property values began to affect liability or a third party's intent was considered *after* the purpose of an easement has been altered, the goalpost for establishing an uncompensated taking is moved. It is conceivable that for many landowners, this leads to an inherent decrease in property interest. Further, Courts cannot reasonably undertake a "but for the NITU" analysis where a trail-use agreement has already been established; requesting the Court to do so would further complicate the unnecessarily ambiguous landscape of rails-to-trails cases. There are limits to the number of hypothetical scenarios the Court can entertain before rendering opinions that are essentially advisory. In cases where plaintiffs have suffered from the government altering an easement without consent, it would be counterproductive to expend resources on speculation. This litigation represents a typical rails-to-trails action where the United States infringed Plaintiffs' property rights for a public improvement project. Thus, once a trail-use agreement was established, Norfolk Southern's intent to abandon became irrelevant.

The United States further uses the proposition that Norfolk Southern's intent is relevant to valuation and negates liability. (Def.'s Mot. for Summ. J. at 12–19). Specifically, the United States purports that Plaintiffs "are not entitled to compensation" and have adduced no evidence that would entitle them to compensation, therefore it believes that dismissal is warranted. (*Id.*). However, this argument presents the logical fallacy of hysteron proteron—it puts the cart before the horse.

Under fundamental constitutional law, private property may not be seized for public use "without just compensation." Notably, the right to compensation is qualified by the term "just," defined by Black's Law Dictionary as being "right; in accordance with law and justice." *JUST Definition & Legal Meaning*, The Law Dictionary, (last reviewed Feb. 22, 2024), https://thelawdictionary.org/just/. This qualification distinguishes takings cases, making them unique.

The customary distinctions between the "liability" and "damages" stages in takings litigation are not precisely defined. Liability is established when a taking occurs, and the private party remains uncompensated. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987) (finding that the Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking."). The scope of "damages" is limited; for instance, compensation is not mandated for losses or expenses incurred by property owners or tenants that are incidental to or arise because of the taking of real property if they do not impact the market value of the property taken. *See e.g., Yuba Nat. Res.,*

*Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990) ("It is a well settled principle of Fifth Amendment taking law . . . that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking."); *United States v. General Motors*, 323 U.S. 373, 380 (1945) ("[T]hat which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and damage to those rights of ownership does not include losses to his business or other consequential damage." (footnote omitted)). Thus, "not all losses suffered by the owner are compensable under the Fifth Amendment." *United States ex rel. Tennessee Valley Auth. v. Powelson*, 319 U.S. 266, 281 (1943). While damages are specifically tailored to the property's value, the valuation process does not directly influence liability. Holding otherwise would negate plaintiffs' burden to establish valuation with specificity and sufficient, reliable proof. *See Gadsden Indus. Park LLC v. United States*, 956 F.3d 1362, 1371 (Fed. Cir. 2020) (affirming award of zero dollars in an inverse takings case where the trial court "was not given sufficient reliable proof of what a willing buyer would have paid for the [property]"); *see also Cully Corp. v. United States*, 163 Fed. Cl. 676, 688 (2022) (awarding zero damages after taking was established because plaintiff failed to offer affirmative evidence proving that it suffered actual monetary loss compensable under the Fifth Amendment); *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987) (finding that plaintiffs are tasked with "proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation."). Because the issue of just compensation does not bear on liability, it is addressed separately below, *see infra.*

Here, Plaintiffs have proven that they have an interest in the underlying property and that Norfolk Southern's easement is limited to rail use. By issuing a NITU and invoking Section 1274(d) of the Trails Act, the United States intervened and blocked Plaintiffs' interests. The subsequent trail-use agreement imposes further encumbrances on Plaintiffs' properties than before. Consequently, they have successfully shown that the United States, through these actions, has taken their property in accordance with the provisions of the Fifth Amendment. To establish liability, no more is required.

> D.   *Dimensions of the Right-of-Way*

Plaintiffs seek to delineate the specific portion of the land subject to the United States' taking. (Pls.' Mot. for Part. Summ. J. at 17). Plaintiffs argue that this determination should be guided by the survey appended to the non-warranty deed executed by Norfolk Southern with the City. (*Id.*). In contrast, the United States maintains that "it is clear from the warranty deed for the Hyatt's property and from the Valuation Maps submitted by the Railway . . . that the Quitclaim Deed is overbroad in its description of the easement." (Def.'s Resp. at 12). Therefore, the United States believes that the Court should limit the easement to what interest it believes Norfolk Southern actually possessed. (*Id.*). The Court finds that while no amount of contrivance can manufacture interest where it does not exist, genuine issues of material fact exist precluding summary judgment.

Per North Carolina law, a quitclaim deed "conveys only the grantor's present interest in the land described, if the grantor has any interest." Patrick K. Hetrick & James B. McLaughlin, Jr., Webster's Real Estate Law in North Carolina § 155 (3rd Ed. 1988). This instrument is one of conveyance and "passes whatever right, title, and interest grantors had power to convey at the

time of its execution and delivery." *Love v. United States*, 889 F. Supp. 1548, 1562–63 (E.D.N.C. 1994) (citing *Hayes v. Ricard*, 245 N.C. 687, 688, 97 S.E.2d 105 (1957)). North Carolina courts have long held that a quitclaim deed conveys no land or indefeasible title but only transfers what the grantor has "to convey and nothing more." *Coble v. Barringer*, 171 N.C. 445, 448, 88 S.E. 518 (1916). Nobody seems to disagree with this premise. (Def.'s Resp. at 11 ("[T]he Railway could not have conveyed a wider corridor than it actually owned."); Pls.' Reply at 18 ("Plaintiffs would certainly agree that a seller cannot sell more than it owns."), *Hyatt* ECF No. 28, *Nicholson* ECF No. 23). The problem here stems from conflicting documents and a line of deeds that do not note the width of the easement.

> The City's purchase and sale agreement with Norfolk Southern specified that:

>> The exact area of land to be purchased is to be determined by a survey [] made by a registered land surveyor licensed in the State of North Carolina [and the Survey] shall set forth the total number of square feet or acres contained within the Premises, together with a metes and bounds description of the Premises.

(Pls.' Mot. for Part. Summ. J. Ex. N). Subsequently, a survey was conducted and attached to the Non-Warranty Deed, which effectively transferred Norfolk Southern's interest in the Corridor to the City. (*Id.* Ex. P). According to this survey, the width of the railroad corridor traversing Plaintiffs' land is purportedly one hundred feet. (*Id.* at 15, 22).

> The United States argues that Plaintiffs' assertion that the 2019 survey is the controlling document incorrectly expands the geographic scope of Norfolk Southern's easement. (Def.'s Reply at 11–13, *Hyatt* ECF No. 27, *Nicholson* ECF No. 22). Defendant supports its position stating that "an earlier warranty deed and other written instruments contradict Plaintiffs' position." (*Id.* at 11). These documents include:

(1) A prior warranty deed on the Hyatt's property describing the railroad easement as sixty-five feet from the centerline of the railroad, (Def.'s Resp. Ex. E (North Carolina General Warranty Deed, dated April 3, 1987));

(2) A Valuation Map for the rail segment behind the Hyatt's property depicting a sixty-five-foot rail easement from the centerline, (*Id.* Ex. G (Interstate Commerce Commission, Valuation Map V-27 S-17b dated December 31, 1927));

(3) A Valuation Map for the rail segment behind the Nicholson property depicting a fifty-foot easement from the centerline, (*Id.* Ex. H (Interstate Commerce Commission, Valuation Map V-27 S-18a, dated December 31, 1927)).

> However, these documents do not explain the conflicting survey dimensions or if there is a reason that the Hyatt and Nicholson deeds are silent as to the dimensions of the easement. It is possible that Norfolk Southern acquired a prescriptive easement within the past thirty-six years. The sole evidence of record as to what was contracted and what led to the current survey is the City's belief that it owns and exercises control over the property delineated in this survey (Pls.' Mot. for Part. Summ. J. Ex. Q, *Hyatt* ECF No. 19-17, *Nicholson* ECF No. 14-7). Based on the known evidence, neither party can prove whether Norfolk Southern had legal title to the

easement interest reflected in the survey attached to the non-warranty deed. Therefore, factual inquiry is required and summary judgment is inappropriate.

      E.    *Valuation and Just Compensation*

Having established that a taking occurred, the Court turns to the parties' argumenta regarding the specific calculation of just compensation. Specifically, Plaintiffs argue that the proper "before and after" method for calculating just compensation includes the addition of severance damages where appropriate. (Pls.' Mot. for Part. Summ. J. at 19–24). Plaintiffs go on to argue that the "before condition" must consider the property to be unencumbered by the rail easement and that the "after condition" must consider that Plaintiffs "have lost the fundamental right to exclude the public from their property." (*Id.* at 24). The United States disagrees. First, the United States argues that the fair market value of Plaintiffs' properties in the "before" condition is ownership subject to a railroad easement because Norfolk Southern did not intend to abandon the easement. (Def.'s Resp. at 7–9). The United States also argues that the "after" condition is ownership subject to a non-exclusive, interim trail use easement. (*Id.* at 9–11). The Court prefaces its finding that just compensation is largely fact-dependent and varies between each case; it does not do to impose legal prohibitions on fact-intensive issues. This Court holds that an expert witness may testify to severance damages. Furthermore, the "before" condition of the property in this case should not include the legal restriction of possessing an easement but may account for the real-world physical condition of the land. However, the United States is free to dispel these notions at trial.

Landowners bear the burden of establishing the value of the railway corridor, which is a question of fact. *Memmer*, 150 Fed. Cl. at 753–54 (internal citations omitted). The Federal Circuit has held that traditional compensation methods are not exclusive; for example, there may be appropriate alternative valuation methods for the taking of an easement. *See Vaizburd v. United States*, 384 F.3d 1278, 1285–87 (Fed. Cir. 2004); *see also Yaist v. United States*, 17 Cl. Ct. 246, 257 (1989) ("The court may use its judgment in selecting the method to determine fair market value.").

In rails-to-trails cases, the Court uses the "before and after" method of assessing damages where just compensation equals the difference in market value of the land before and after the easement is imposed. *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 11358, 1364 (Fed. Cir. 2012). Although "the 'conventional' method" of valuing an easement "is the 'before-and-after' method, i.e., 'the difference between the value of the property before and after the Government's easement was imposed[,]' . . . there may be appropriate alternative valuation methods for the taking of an easement." *Id.* at 1364 (internal quotes omitted); *see also Balagna v. United States*, 138 Fed. Cl. 398, 404 (2018). In ruling on the disputes over valuation standards in takings cases, the Court is cognizant of the guiding principle that "just compensation should be carefully tailored to the circumstances of each particular case." *Otay Mesa Prop.*, 670 F.3d at 1368.

The Court may exclude legal restrictions in calculating the "before and after" condition of properties. In *Moore v. United States*, 54 Fed. Cl. 747, 749 (2002), the Court held that "fair market value of the entire affected parcel [is determined] as if the easement did not exist and then another determination in light of the taking." The next year, this Court went on to explain that the "before and after" calculation requires "a determination of the fair market value of the

entire affected parcel as if the easement did not exist and then another determination in light of the taking." *Illig v. United States*, 58 Fed. Cl. 619, 624 (2003) (citing *Moore*, 54 Fed. Cl. at 749)). In 2011, the Court held:

> [T]he extent of the taking depends not on plaintiffs' property interests at the time of the NITU, but rather "upon the nature of the state-created property interest that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest." This view is consistent with well-settled Federal Circuit precedent that "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." Because the easement would have reverted back to plaintiffs under state law, the fee simple value of plaintiffs' properties is the appropriate starting point in a damages analysis for just compensation; the appropriate measure of damages is the difference between the value of plaintiffs' land unencumbered by a railroad easement and the value of plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad.

*Raulerson v. United States,* 99 Fed. Cl. 9, 12 (2011) (internal citations omitted).

This Line does indeed present a slightly unique set of circumstances from prior cases because Norfolk Southern and the City reached an agreement *before* the NITU; thus, as the United States maintains, if there were no NITU, there would be no abandonment. (Def.'s Mot. for Summ. J. Ex. A ¶ 10 ("If a final trail use agreement had not been reached, Norfolk Southern would not have abandoned the Corridor and would have instead maintained ownership of its rights and sought authority to discontinue service[.]"; *Id.* Ex. B 24:19–22 ("If a NITU was not granted, Norfolk Southern would have withdrawn its [Notice of Exemption] and filed to discontinue service.")). Plaintiffs argue that, despite their intent, the before condition of this Line should exclude Norfolk Southern's easement; the United States says that this would be inaccurate, as Norfolk Southern would not have abandoned the Line but for the NITU. (Pls.' Mot. for Summ. J at 21; Def.'s Resp. at 7–9). The United States has not shown that it is entitled to that conclusion as a matter of law. The United States' position unnecessarily muddies already murky water and provides an unwarranted loophole for trail negotiations.

Regardless of how value is calculated, it must account for the physical condition of the property at the time of the taking. *See Rasmuson v. United States*, 807 F.3d 1343, 1345–46 (Fed. Cir. 2015) ("[T]he fair market value of the land includes the physical remnants of the railway that would have remained on the landowners' property but for the issuance of the NITUs. . . [A] 'before' calculation that does not account for the costs of removing the physical remnants of the railway will result in an artificially inflated value and yield a windfall to the landowner."). In *Rasmuson*, the parties disagreed whether the "before" condition should include the remnants of the railroad's use, including earthen embankments, ties, and poor soil conditions. *Id.* The Federal Circuit found that the "before" condition "has to account for [the] physical conditions," of the land when "[a]bsent the NITUs, the land would have returned to the landowners," with those physical conditions. *Id.* at 1346. *Rasmusen* and related cases show that the "before" conditions distinguish between land that is free of legal restrictions and land that is free of the whispers of a

railway. The real-world conditions that the "before" condition must consider is the *physical* condition of the property, unencumbered by the easement that the NITU extended.

As to whether severance damages are viable, there is nothing prohibiting valuation experts from testifying to this. The United States is under the belief that, when the before-and-after method is properly conducted, it automatically includes any damages to the remainder. (Def.'s Resp. at 5). Although the parties' experts may not testify as to how legal uncertainties, such as landowners' ability to exclude the public, will be resolved in the future, they may testify as to how the uncertainty impacts market value. *Loveridge v. United States*, 167 Fed. Cl. 44, 52 (2023) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (recognizing "the viability of claims for severance damages based on the likelihood that prospective buyers would fear hazards arising from Government's use" of property)).

Regarding the remaining arguments, the Court declines to rule. As it relates to the "after" condition, the United States argues that the calculation should consider that the property is non-exclusive and does not interfere with Plaintiffs' use of the property. (Def.'s Mot. for Summ. J. at 21). The United States has not conclusively shown that this position is supported under North Carolina law. This, too, is a finding proper following trial testimony and after reviewing facts pertaining to the degree of interference with Plaintiffs' use of the property. In takings cases, landowners are entitled to assume that the United States will make full use of all rights that it has taken, even if it is not exercising that right in the present. *See e.g.*, *2,953.5 Acres of Land v. United States*, 350 F.2d 356, 360 (5th Cir. 1965) ("The Government concedes, as it must, that the landowners are entitled to assume in the condemnation suit that the Government will make the full use physically possible of any easement" taken); *Cheshire Hunt v. United States*, 157 Fed. Cl. 101, 111 (Fed. Cl. 2022) (recognizing "the common sense understanding that an easement holder may use the entirety of the burdened property for the purpose of the easement."). "The United States is free to disabuse landowners of that notion, but it must do so per principles of property law." *Loveridge*, 167 Fed. Cl. at 52. Those principles mandate that if the United States wishes "to limit the exercise of its rights under the easement to its current use or the prospective use envisaged by its expert," it should commit to that position through "formal action," such as a deed, release, or otherwise. *Id.* (citing Nichols on Eminent Domain § 16.01 (citing *Spinner v. State*, 4 A.D.2d 987, 167 N.Y.S.2d 731 (1957))); *see also Dana R. Hodges Trust v. United States*, 111 Fed. Cl. 452, 459 (2013) (denying crossing rights damages when rights were protected in "original recorded deeds" and therefore could not form basis for damages). Therefore, the Court cannot find that Plaintiffs are barred as a matter of law from presenting damages calculations that assume the possibility of interference with their use.

Plaintiffs contend that the right to exclude others has been unjustly compromised in the wake of this conversion and should be considered in the "after" condition. (Pls.' Mot. for Summ. J. at 24–27). Again, an expert is free to testify to this, subject to evidentiary scrutiny. Appraisers are responsible for assessing whether a reasonable buyer would be troubled by such potential losses and the difficulties of remedying them in a manner that is reflected in the market value of the properties. *See e.g.*, *Dana R. Hodges Trust*, 111 Fed. Cl. at 458–59 ("[I]f the limitations on any crossing rights to which the various Plaintiffs may be entitled by operation of state property law diminish the highest and best use of their lands . . . then such diminished value ought to be reflected in the parcels' appraisals in the "after" condition"); *Moore v. United States*, 61 Fed. Cl. 73 (Fed. Cl. 2004) (appraisal must ask "would a reasonable buyer be concerned about the

potential loss of access across the Trail?"). In *Boyer v. United States*, the Court concluded that appraisals should determine (1) "what a willing buyer would pay for the subject properties," (2) "whether such a buyer would be concerned about potential litigation over the right or location of access across the trail," and (3) "whether this concern would then translate to a diminution in the value of the property." 135 Fed. Cl. 121, 130 (2017). As in *Boyer*, the expert appraisal shall not exclude the opportunity to show that a reasonable buyer's assessment of market value may still be impacted by the possibility of that scenario occurring. *Id*.

Finally, it would be impetuous to rule on the United States' argument that Plaintiffs have failed to offer proof as to just compensation and could not do so even if they did have proof, (Def.'s Mot. for Summ. J. at 12–19). The Court cannot yet decide this issue. Even if valuation discovery were concluded on both sides, it is highly improbable that this Court would determine the quantum of just compensation based solely on written submissions. (*See* Status Conf. Tr. 48:19–22 (Judge: [I]f we get into a situation where different experts are opining -- you know, that's trial stuff. That's not stuff I can resolve on summary judgment."), *Hyatt* ECF No. 14). Once a taking has been classified as either temporary or permanent, the Court applies the appropriate method of determining just compensation. *Otay Mesa*, 670 F.3d at 1364. The Federal Circuit has held that traditional compensation methods are not exclusive; for example, there may be appropriate alternative valuation methods for the taking of an easement. *See Vaizburd*, 384 F.3d at 1285–87. However, this is a fact-intensive process, often necessitating judging the credibility of expert witnesses and personally conducting a site visit. The Court finds that Plaintiffs are entitled to complete expert discovery as to valuation before the issue of just compensation is ripe.[5]

### III.     Conclusion

The Court denies the United States' Motion for Summary Judgment, (*Hyatt* ECF No. 18. *Nicholson* ECF No. 13), and grants-in-part Plaintiffs' Partial Motion for Summary Judgment, (*Hyatt* ECF No. 19, *Nicholson* ECF No. 14). With the knowledge that determinations as to just compensation are extremely fact-intensive and would likely require a trial, the Court **ORDERS** the Parties to meet and confer and submit a joint status report with a proposed schedule for valuation discovery and pretrial proceedings by March 28, 2024.

**IT IS SO ORDERED.**

s/   David A. Tapp
DAVID A. TAPP, Judge

---

[5] The Court acknowledges that there have been comparable cases concerning the identical rail line that concluded at the trial court level, resulting in some incidental valuation discovery. Nevertheless, the Court is hesitant to compel Plaintiffs to depend on those reports in this instance. This information will be considered when formulating the pretrial schedule moving forward.